# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 5, 2024        Decided June 13, 2025

No. 23-1164

TROY GROVE, A DIVISION OF RIVERSTONE GROUP, INC. AND
VERMILION QUARRY, A DIVISION OF RIVERSTONE GROUP,
INC.,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL
150, AFL-CIO,
INTERVENOR

———

Consolidated with 23-1176, 23-1343

———

On Petitions for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Arthur W. Eggers* argued the cause for petitioner Troy Grove. With him on the briefs was *James S. Zmuda*.

*Steven A. Davidson* argued the cause for petitioner International Union of Operating Engineers, Local 150, AFL-CIO. With him on the briefs was *Charles R. Kiser*.

*Barbara Sheehy*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Jennifer A. Abruzzo*, General Counsel, *Peter Sung Ohr*, Deputy General Counsel, *Ruth Burdick*, Acting Deputy Associate General Counsel, *David Habenstreit*, Assistant General Counsel, and *Usha Dheenan*, Supervisory Attorney.

Before: KATSAS and RAO, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: The National Labor Relations Board ruled that Troy Grove and Vermilion Quarry, two divisions of RiverStone Group, Inc., violated the National Labor Relations Act. Seven employees worked at these two quarries—four at Troy Grove, three at Vermilion Quarry—and together they constituted a bargaining unit represented by the International Union of Operating Engineers, Local 150, AFL-CIO. The case is here on the company's[1] and the union's petitions for judicial review and the Board's cross-application for enforcement of its order.

---

[1] Technically, RiverStone, not its two divisions, may be the proper petitioner, but this has no effect on the issues presented. *See Midwest Operating Eng'rs Welfare Fund v. Cleveland Quarry*, 844 F.3d 627, 628 (7th Cir. 2016).

The company objects to the Board's decision that it committed unfair labor practices in bargaining with the union about a pension fund and in its treatment of two quarry employees one afternoon. The union objects to the Board's selected remedies.

Part I of our opinion analyzes the bargaining issue and the union's objections. Part II analyzes the remaining issue regarding the two employees.

**I.**

**A.**

The evidence about the bargaining issue tended to show the following.

The union and the company entered into a collective bargaining agreement that ran from July 2014 to May 2016. The agreement required the company to contribute to the Midwest Operating Engineers Pension Fund.[2] As the agreement's expiration date approached, the company and the union began negotiating a new contract. After a bargaining session in April 2016, the company learned that its withdrawal liability to the Pension Fund for the seven employees in the bargaining unit had increased over a two-year period from approximately $964,000

---

[2] The Pension Fund is a multi-employer defined benefit plan, the details of which are rather unimportant to our decision. *See generally* Elizabeth A. Myers & John J. Topoleski, Cong. Rsch. Serv., R43305, *Multiemployer Defined Benefit (DB) Pension Plans: A Primer* (2020).

to $1,353,000.[3] The company, concerned about mismanagement of the Pension Fund, decided that it had to withdraw from the Fund to avoid incurring even greater potential liability.

For the next two years, from 2016 to 2018, as the parties negotiated a replacement contract, the company offered, and the union refused to accept, the company's proposal to enter into a contract in which the company would withdraw from the Pension Fund.[4]  At the end of these two years of negotiations, the company presented its "last, best, and final offer" to discontinue contributing to the Pension Fund.  *Troy Grove & Int'l Union Operating Eng'rs, Loc. 150*, 372 N.L.R.B. No. 94, at 19 (June 22, 2023).

A majority of the seven quarry employees voted to strike. The strike began in March 2018 and continued through 2021. While the strike was underway, the company hired replacement employees.  *See RiverStone Grp., Inc. v. Midwest Operating Eng'rs Fringe Benefit Funds*, 33 F.4th 424, 426 (7th Cir. 2022).

No movement in the parties' bargaining positions occurred during the years of the strike.  The parties came to the bargaining table again on July 12, 2021, five years after the beginning of negotiations for a replacement contract.  At the July 12 meeting,

---

[3] "Withdrawal liability" requires employers withdrawing from such a fund to cover their portion of the plan's under-funding.  *See* 29 U.S.C. § 1381.

[4] Some of the company's proposals, which the union rejected, would have diverted its contributions from the Pension Fund to the Midwest Operating Engineers Retirement Enhancement Fund.  The Enhancement Fund is a defined contribution plan—a retirement savings plan in which employees or employers contribute a set amount to individual accounts.

the union once more proposed a new contract requiring the company to continue making contributions to the Pension Fund. The company counter-proposed a contract ending its contributions to the Fund. The company asked the union if it would accept a contract that did not include contributions to the Pension Fund. The union replied that it would not. The union asked the company if it would accept a contract that included continuing the contributions. The company replied that it would not.

Given this exchange, the company indicated that the parties were at an "impasse." The union replied that it would try to put together a new proposal, but—and this is important—the union did not suggest that it would, or even might, be willing to relieve the company from contributing to the Pension Fund. The parties scheduled another meeting for July 21, 2021.

On July 14, 2021, two days after the meeting just described, the company emailed a letter to the union summarizing that meeting and indicating again that they were at an "impasse." The union replied by email on the same day, giving its summary of the July 12 meeting and denying that the parties were at an "impasse." Also on July 14, the union sent another letter to a company official requesting a wide variety of information, among which were all corporate earnings from 2015 forward; all sales and profits from the two quarries; the amount of each product sold per year; price sheets; the name and contact information for each member of RiverStone's Board of Directors; the cost of items associated with "weathering the strike"; legal costs dating back to 2016; and information relating to employee demographics and compensation. In its initial response, the company provided 288 pages of material. Ultimately, the company gave the union just about all it requested.

During the remaining days before the scheduled July 21 negotiating session, the parties continued exchanging emails. We see no need to go into detail about much of their correspondence. It is fair to say that both parties were still at loggerheads and were now considering the possibility of litigation, and that both were, in their emails, posturing in contemplation of that event.

On July 19, the company reiterated its refusal to agree to a contract requiring it to continue making contributions to the Pension Plan. The company again stated that the parties were at an "impasse." In response, the union denied that the parties were at an "impasse" and that the union had "never said . . . never." J.A. 5742. The union repeated its request for information regarding "the seniority list, age of the employees, hours each employee worked per year, the 401K rates, wage rates and increases, healthcare contribution rates, etc." *Id.* The union claimed that it needed this information to prepare a "counterproposal." *Id.* The union did not explain why its seven union members could not have provided almost all of this information. Nor did the union indicate that it might be considering, as a "counterproposal," agreeing to the company's position regarding the Pension Fund.

At the July 21, 2021, bargaining session, neither party produced a new proposal. The company, repeating that the parties were at an "impasse," threatened to cease making contributions to the Pension Fund (a threat it did not carry out). The General Counsel's complaint alleged that the company thereby committed an unfair labor practice because the parties were not actually at an "impasse."

**B.**

The Board, relying mainly on the opinion of the Administrative Law Judge, ruled that the company and the union were not at an "impasse." *See Troy Grove*, 372 N.L.R.B. No. 94, at 3. Over the dissent of Member Kaplan, the two-member Board majority held that the company had therefore bargained in "bad faith" in violation of sections 8(a)(5) and (1) of the Act by "threatening" to end its contributions to the Pension Fund. *Id.* The Board's decision is not supported by substantial evidence and its legal analysis is irrational.

Employers must bargain in "good faith,"[5] and unions must do the same. 29 U.S.C. § 158(d). As in any negotiation, the parties may not reach an agreement even if both have bargained in "good faith." Board law calls such a deadlock or stalemate an "impasse," a word (not found in the Act) that became and still is "an imprecise term of art." *Laborers Health & Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 543 n.5 (1988) (quoting *Laborers Health & Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co.*, 779 F.2d 497, 500 n.3 (9th Cir. 1985)). One definition of "impasse" is "that point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless." *Id.* (quoting *Laborers Health*, 779 F.2d 497, 500 n.3).

It would be a mistake to portray an employer's bargaining to "impasse" as some sort of bargaining sin. "Impasse," as defined in labor law, is "a recurring feature in the bargaining process, . . . a temporary deadlock or hiatus in negotiations 'which in almost all cases is eventually broken, through either a change of mind or the application of economic force.'" *Charles*

---

[5] An employer's "good faith" has long has been a concept fraught with uncertainty. *See* Note, *Employer "Good Faith Doubt"*, 116 U. Pa. L. Rev. 709, 726 (1968).

*D. Bonanno Linen Serv., Inc. v. NLRB*, 454 U.S. 404, 412 (1982) (quoting *Charles D. Bonanno Linen Serv., Inc.*, 243 N.L.R.B. 1093, 1093-94 (1979)). The Board, with the Supreme Court's approval, has recognized that the "use of impasse" is a legitimate "bargaining tactic." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 239 (1996). "Indeed, an impasse may be brought about intentionally by one or both parties as a device to further, rather than destroy, the bargaining process." *Bonanno Linen*, 243 N.L.R.B. at 1094.

At "impasse" employers have several options: "(1) maintain the status quo, (2) implement their last offer, (3) lock out their workers (and either shut down or hire temporary replacements), or (4) negotiate separate interim agreements with the union." *Brown*, 518 U.S. at 245. An employer, during an "impasse," is not required to bargain with the union. But "'impasse' is often temporary," and therefore "employers must stand ready to resume collective bargaining." *Id.* at 245, 244.

Two aspects of this case set it apart from many, if not most, of the Board's "impasse" cases charging employers with unfair labor practices.[6] The first is that, although stating its belief that the parties were at an impasse, the company did not implement its "last, best, and final" proposal to cease contributing to the Pension Fund. The second is that the company continued to "bargain" with the union even after announcing that they were at "impasse."[7]

---

[6] We have yet to discover a case charging a union with an unfair labor practice for wrongly declaring an "impasse," a quite improbable prospect for reasons stated *infra*.

[7] Whether the company and the union met again face-to-face is unclear, but they continued to communicate about labor relations.

Despite these distinguishing features, the Board determined that the company had not negotiated in "good faith," and therefore had committed an unfair labor practice when it informed the union of the obvious legal consequences of an "impasse"—namely, that the company could and would implement its last best offer (although it did not do this).

The Board held that the company's so-called "threat" to do what an "impasse" entitled it to do violated the Act because the parties were not then at an "impasse."  We disagree with the Board's premise that the parties were not at an "impasse."[8]

As to whether there was an "impasse," the Board adopted the reasoning of the Administrative Law Judge.  *See Troy Grove*, 372 N.L.R.B. No. 94, at 5-6 (citing *Troy Grove, a Div. of Riverstone Grp., Inc., Vermillion Quarry, a Div. of Riverstone Grp., Inc. & Int'l Union Operating Eng'rs, Loc. 150, AFL-CIO*, No. 25-CA-276061, 2022 WL 970302 (Mar. 29, 2022) (appended to *Troy Grove*, 372 N.L.R.B. No. 94, at 13)).  The ALJ relied on *Taft Broadcasting Co.*, 163 N.L.R.B. 475 (1967), *petition for rev. denied sub nom. Am. Fed'n of Television & Radio Artists v. NLRB*, 395 F.2d 622 (D.C. Cir. 1968).  From the Board's oft-cited *Taft* opinion,[9] the ALJ quoted part of this periodic sentence: "The bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, the contemporaneous understanding of the parties

---

[8] Member Kaplan dissented on the basis that a threat to implement a proposal, even if the parties were not at an "impasse," is not a violation of the duty to bargain in "good faith."  *See Troy Grove*, 372 N.L.R.B. No. 94, at 9-12 (Member Kaplan, dissenting). Because the parties were at an "impasse," we do not reach the issue.

[9] *See, e.g., Brown*, 518 U.S. at 246; *Thrifty Payless, Inc. v. NLRB*, 86 F.4th 909, 917 (D.C. Cir. 2023); *Laurel Bay Health & Rehab. Ctr. v. NLRB*, 666 F.3d 1365, 1373 (D.C. Cir. 2012); *TruServ Corp. v. NLRB*, 254 F.3d 1105, 1114 (D.C. Cir. 2001).

as to the state of negotiations are all relevant factors to be considered in deciding whether an impasse in bargaining existed." 163 N.L.R.B. at 478.[10]

The "bargaining history" in this case strongly supported the company's judgment that the parties had reached a negotiating impasse by 2021, or even much earlier. Consider the evidence. The union and the company met face-to-face at least 26 times over a five-year period beginning in 2016 without reaching an agreement. During the second year of their negotiations, the company presented its last, best offer to withdraw from the Pension Fund. The union responded by calling a strike. The strike lasted for at least three more years, thus demonstrating—in *Taft's* words—"the importance of the issue" about which the parties disagreed.

The ALJ's opinion (and hence the Board's) gave no indication that this five-year "bargaining history" counted for anything. Compare that to the Board's analysis in *Taft*—an analysis upheld by our court—that the parties in that case had reached an "impasse" because they met 27 times over a mere *three-month* period without coming to an agreement. *See Am. Fed'n of Television & Radio Artists*, 395 F.2d at 624.

We are engaged in "substantial evidence" review of the Board's action pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(E), and the National Labor Relations Act, 29 U.S.C. § 160(e). *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-85 (1951); *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366 (1998). The Board "must draw all those inferences that the evidence fairly demands. 'Substantial evidence' review exists precisely to ensure that the Board achieves minimal compliance with this obligation, which is the foundation of all honest and legitimate adjudication." *Allentown Mack*, 522 U.S. at 378-79.

---

[10] This multi-factor list without any assigned weights is "by no means a 'test.'" *Thrifty Payless*, 86 F.4th at 914.

The Board in this case did not achieve even "minimal compliance" with its duty to draw the inferences demanded from the parties' bargaining history. After recounting the evidence, the ALJ explained it should be disregarded: "At no time, however, did both parties understand themselves to be at an impasse." *Troy Grove*, 2022 WL 970302; *Troy Grove*, 372 N.L.R.B. No. 94, at 27. That explanation is not supported by "substantial evidence." In fact, it is not supported by any evidence. And the ALJ's underlying legal theory, adopted by the Board, is irrational.

What moved the ALJ to make such a gross evidentiary blunder is difficult to understand. If five years of unproductive bargaining over the Pension Fund issue, and a three-year strike, were not enough to prove that progress in negotiations had hit a brick wall, the undisputed testimony recounting the following exchange at the parties' July 2021 meeting proved this beyond a reasonable doubt:

> Company to Union: Would the Union agree to a contract that did not include contributions to the Pension Fund?

> Union: No.

> Union to Company: Would the Company agree to a contract that included continuing contributions to the Pension Fund?

> Company: No.

*See Troy Grove*, 2022 WL 970302; *Troy Grove*, 372 N.L.R.B. No. 94, at 21.

In stating that, "At no time, however, did *both* parties understand themselves to be at an impasse," perhaps the ALJ meant something else—that because the union denied that the parties were at impasse, they were not. *Troy Grove*, 2022 WL 970302; *Troy Grove*, 372 N.L.R.B. No. 94, at 27 (emphasis added). That rationale is irrational. It is arbitrary, capricious,

and senseless.

It amounts to the faintly ridiculous proposition that the parties were not at an impasse because they were at an impasse about whether they were at an impasse. Our court has rejected this absurdity. "A union official's denial that an impasse exists, combined with a new negotiating proposal that does not meet the employer's position, does not rebut an impasse." *Mike-Sell's Potato Chip Co. v. NLRB*, 807 F.3d 318, 324 (D.C. Cir. 2015); *see also TruServ*, 254 F.3d at 1117; *Laurel Bay*, 666 F.3d at 1375.[11] The reason should be obvious, although it seems to have eluded the ALJ and thus the Board. We explained that "it is hard to conceive of a scenario—and the caselaw does not suggest one—in which a union will ever declare an impasse. After all, an impasse enables the employer to implement its last offer. That means the union will always contend that talks must go on. So a union's 'professions' to that effect must be considered alongside 'objective evidence' of the movement in its bargaining position over the course of the negotiations." *Thrifty Payless*, 86 F.4th at 917 n.4 (quoting *Atrium of Princeton, LLC v. NLRB*, 684 F.3d 1310, 1312-13 (D.C. Cir. 2012)).[12]

---

[11] The ALJ also found no impasse because, "[h]ad the negotiations continued, it is plausible that Local 150 would have been flexible with the pension contributions . . . ." *Troy Grove*, 372 N.L.R.B. No. 94, at 27. This is pure speculation, contradicted by five years of bargaining history. More than that, the "Board itself has indicated that a party's 'bare assertions of flexibility on open issues and its generalized promises of new proposals [do not clearly establish] any change, much less a substantial change' in that party's negotiating position." *Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 233 (D.C. Cir. 1996) (alteration in original) (quoting *Civic Motor Inns*, 300 N.L.R.B. 774, 776 (1990)).

[12] *See also Mike-Sell's*, 807 F.3d at 323 ("Thus although it is often said by both the Board and courts that an impasse exists when *both* parties believe bargaining has reached a dead end, as we recently recognized in *TruServ*, '[a] contemporaneous understanding as to impasse does not . . . require the parties to reach mutual agreement as to the state of negotiations.' If the law were otherwise, an employer

The Board, but not the ALJ, added that the parties had not reached an "impasse" because the union, in a letter, made an information request the company had not yet satisfied in July 2021. *Troy Grove*, 372 N.L.R.B. No. 94, at 5. But the union's request for information—a request made for the first time after five years of negotiations—came too late to avert an impasse. The union sent its letter two days after the parties' meeting of July 12, 2021, during which the company indicated that the parties were at an impasse, as they clearly were for the reasons already stated. The request was an obvious ploy. If a union's "last minute movement, short of agreement" cannot avoid an impasse, neither can a union's "movement" after impasse has already been reached. *Mike-Sell's*, 807 F.3d at 323. We have concluded that comparable union actions did not constitute substantial evidence supporting a no impasse finding. *See Laurel Bay*, 666 F.3d at 1375; *TruServ*, 254 F.3d at 1117. So here.[13]

## II.

### A.

On December 7, 2020, seven months before the parties restarted their negotiations, a bargaining unit employee filed a petition to decertify the union. Employees voted using mail-in ballots, which were to be counted on February 16, 2021. Lyle Calkins and Brad Lower, who had returned to work, informed their supervisor, Thomas Becker, that they were serving as observers for the vote count on behalf of the union. The employees voted 4-2 against decertification.

An hour after Calkins and Lower returned from monitoring

---

would virtually never be entitled to implement a final offer. It would, in effect, require the union's consent." (alterations in original) (citations omitted)).

[13] Because we reject the Board's no-impasse finding, we do not reach the union's argument that the Board's remedial order was insufficient.

the tally, supervisor Becker handed them temporary layoff notices, effective at the end of the day. The company had a practice of temporarily laying off its employees if there was no indoor work and cold weather prevented them from working outdoors. Layoffs had to comply with the expired collective bargaining agreement.[14] The agreement required that layoffs be determined in order of seniority, all else being equal. Calkins and Lower were the second- and third-most senior employees, respectively. Knowing that three more-junior employees were working that day, Calkins asked supervisor Becker if he knew who would be loading trucks at the Vermilion quarry. The company would have been in violation of the bargaining agreement if it allowed a more junior employee to work while temporarily laying off Calkins and Lower. Becker responded that he needed to call his supervisor and left the work area. When Becker returned, he explained that there was too much work to do and rescinded the not-yet-effective layoff notices.

Upon the union's unfair labor charges, the Board's General Counsel filed a complaint alleging that the company laid off Calkins and Lower for supporting the union, and that, in doing so, the company violated sections 8(a)(3) and (1) of the Act. *See* 29 U.S.C. § 158(a)(3), (1). The Board's ALJ agreed. *Troy Grove*, 2022 WL 970302; *Troy Grove*, 372 N.L.R.B. No. 94, at 26. On review, the Board disagreed with the ALJ's finding that the company had violated the Act by laying off Calkins and Lower. *Troy Grove*, 372 N.L.R.B. No. 94, at 2. In the Board's view, the employees did not suffer an adverse employment action because the layoff notices "were rescinded *before* they took effect and *before* the men stopped working for the day." *Id.*

The Board then, *sua sponte*, found that the company violated section 8(a)(1) when it issued the layoff notices. *Troy Grove*, 372 N.L.R.B. No. 94, at 2. The Board's reasoning was

---

[14] When a collective bargaining agreement expires, the employer must "maintain the status quo as to terms and conditions of employment," pending the negotiation of a new contract. *Wilkes-Barre Hosp. Co., LLC v. NLRB*, 857 F.3d 364, 373-74 (D.C. Cir. 2017).

as follows. The layoff notices to Calkins and Lower, within hours of their participation in union activity, did not follow seniority and were issued without explanation. The layoffs were inconsistent with the company's cold weather layoff practice because both employees had been assigned indoor roles. The company's rapid rescission of the layoff notices supported an inference that the company issued the notices in retaliation for Calkins's and Lower's acting on behalf of the union. This evidence, the Board held, demonstrated that the layoff notices reasonably tended to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by the Act. 29 U.S.C. § 158(a)(1).

**B.**

Section 10(e) of the Act provides that "[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). A party's failure to object "to the Board's decision in a petition for reconsideration or rehearing . . . prevents consideration of the question by the courts." *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982).

Because the company did not file a motion for reconsideration, the Board argues that we may not consider the company's objections to the Board's decision about the layoff notices. N.L.R.B. Resp. Br. at 19. We do not believe the company needed to file a reconsideration motion to comply with section 10(e). The company's exceptions to the ALJ's decision were sufficient. It is true that the company challenged the ALJ's ultimate conclusion—its finding of section 8(a)(3) and (1) violations—but it did so by attacking each of the ALJ's subsidiary premises. And the Board relied on exactly those premises in making its *sua sponte* determination that the company had violated section 8(a)(1).

The ALJ's and the Board's finding of a section 8(a)(1) violation relied on the premise that Calkins and Lower were laid

off because of their roles as union observers. *See Troy Grove,* 372 N.L.R.B. No. 94, at 2 ("Respondent's rescission of the layoffs, only 90 minutes after their issuance, would reasonably support the notion in employees' minds that the notices were initially issued as a knee-jerk reaction to protected activity."); *id.* at 26 ("There is strong circumstantial evidence that the active roles undertaken by Lower and Calkin in supporting Local 150 motivated the Company to lay them off."). The company's exceptions contested the causal link between its action and protected union activity. *See* J.A. 6087. The Board's characterization of the underlying actions—the layoff notices to Calkins and Lower and the rescission of the notices—did not render the company's objections any less on point.

The company also excepted to the ALJ's "finding[s] or conclusion[s]" that supervisor "Thomas Becker failed to provide a reason for issuing the layoff notices," J.A. 5903 ¶ 7, and that "the issuance of layoff notices . . . disregard[ed] employee seniority rights," *id.* ¶ 9. The Board relied on both of these findings when it determined that the company had violated section 8(a)(1). *See Troy Grove,* 372 N.L.R.B. No. 94, at 2 ("The layoff notices, which did not follow seniority, were issued without explanation . . ..") (footnote omitted).

It follows that the issues raised in the company's petition for judicial review satisfied section 10(e).

## C.

Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7 of the Act]." 29 U.S.C. § 158(a)(1). Under section 7, employees have "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." *Id*. § 157. The Board considers whether an employee would reasonably understand the employer's conduct

to threaten employees with discipline for protected activity. *See Dover Energy, Inc. v. N.L.R.B.*, 818 F.3d 725, 730 (D.C. Cir. 2016). The Board's findings of fact must be supported by "substantial evidence." 29 U.S.C. § 160(e).

The company argues that the timing of the layoff notices, issued shortly after the vote tally, cannot support an inference that the company penalized Calkins and Lower for their protected activity. RiverStone Br. at 15. In so arguing, the company relies on *Garrison Coal Co.*, 154 N.L.R.B. 794 (1965). There, the Board's General Counsel alleged that Garrison Coal's firing of employees one day after they engaged in protected union activity amounted to unlawful retaliation in violation of section 8(a)(3). *Id.* at 800. The Board disagreed and found that the timing of the layoffs, without other evidence, could not support the allegation. *Id*. In this case, the Board identified multiple factors indicating the coerciveness of the layoff notices. These include the company's failure to tell the employees why they were being laid off, the company's failure to follow seniority, the proximity of the notices to the election tally, the inconsistency with the company's "cold weather layoff practice as the men were in the middle of an indoor assignment," and the company's prompt rescission of the notices. *See Troy Grove*, 372 N.L.R.B. No. 94, at 2.

The company's additional arguments are of a piece. Each looks to the Board's interpretation of the record and suggests how the facts might leave a different, non-coercive impression on an employee. For example, the company suggests that employees would have understood weather-related layoffs, issued in the winter, to be part of the company's ordinary operations. Or that the company's rescission of the notices, after Calkins inquired about work at the Vermilion quarry, indicated to employees that the issuance of layoff notices was not responsive to union conduct.

The company's alternate interpretation of the evidence may be possible, but "the Board's interpretation of the facts is reasonably defensible," and so we deny this aspect of the

company's petition for review. *Dean Transp., Inc. v. NLRB*, 551 F.3d 1055, 1061 (D.C. Cir. 2009) (quoting *Pa. Transformer Tech., Inc. v. NLRB*, 254 F.3d 217, 224 (D.C. Cir. 2001)).

## III.

For the foregoing reasons, we grant the company's petition for review regarding the Board's decision that it had committed unfair labor practices in violation of sections 8(a)(5) and (1) of the National Labor Relations Act when it threatened to cease contributions to the Pension Fund. Accordingly, we vacate the Board's order in relevant parts and deny the union's petition for review. In all other respects, RiverStone's petition is denied and the Board's cross-application for enforcement is granted.

*So ordered.*